

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| DORIS STAEHR, Derivatively On Behalf of COCA-COLA ENTERPRISES, INC., | Case No._____ |
| | **1 06-CV-0467** |
| Plaintiff, | **-JEC** |
| vs. | |
| | DERIVATIVE ACTION |
| JOHN R. ALM, LOWRY F. KLINE, PATRICK J. MANNELLY, RICK L. ENGUM, E. LISTON BISHOP, III, G. DAVID VAN HOUTEN, JR., J. TREVOR EYTON, GARY P. FAYARD, L. PHILLIP HUMANN, PAULA G. ROSPUT REYNOLDS, MARVIN J. HERB, JAMES E. COPELAND, JR., CALVIN DARDEN, J. ALEXANDER M. DOUGLAS, JR. IRIAL FINAN, HOWARD G. BUFFETT, STEVEN J. HEYER, DEVAL L. PATRICK, JOHN L. CLENDENIN, JOHN E. JACOB, AND SUMMERFIELD K. JOHNSTON, JR., | JURY DEMAND |
| Defendants | |
| -and- | |
| COCA-COLA ENTERPRISES, INC., a Delaware corporation, | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF CORPORATE ASSETS AND UNJUST ENRICHMENT**

Plaintiff, by her attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.



1

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Coca-Cola Enterprises ("CCE" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment that occurred between October 2003 and the present (the "Relevant Period") and that have caused substantial losses to CCE and other damages, such as to its reputation and goodwill.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a)(2), because complete diversity exists between plaintiff and each defendant, and the amount in controversy exceeds $75,000. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

3.      This Court retains general jurisdiction over each named defendant who is a resident of Georgia. Additionally, this Court has specific jurisdiction over each named non-resident defendant because these defendants maintain sufficient minimum contacts with Georgia to render jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. CCE maintains its principal place of business in Georgia, and because the allegations contained herein are brought derivatively on behalf of CCE, defendants' conduct was purposefully directed at Georgia. Defendants' conduct arose out of Georgia, where CCE maintains its corporate headquarters. Finally, exercising jurisdiction over named nonresident defendants is reasonable.

2

4.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to CCE occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

### SUMMARY OF THE ACTION

5.      During the Relevant Period, defendants caused or allowed CCE to disseminate public statements, including earnings conference calls, earnings press releases, and filings with the Securities and Exchange Commission ("SEC"), that were materially false and misleading because they misrepresented the true reasons for the Company's historical financial performance and its ability to meet publicly disseminated projections of future revenues, earnings and growth in the volume of its sales of soft drink products under its exclusive licensing, trademark and distribution agreements with The Coca Cola Company ("Coke").

6.      In particular, the Company's Relevant Period statements failed to disclose to the Company's shareholders and investors that, CCE had a longstanding, systemic practice of stuffing its retail and reseller channels with its soft drink and beverage products. Such practices, although widely known internally throughout CCE's management ranks, and highly material to the reasons CCE historically meet projected earnings guidance, were never disclosed.

7.      Rather, defendants caused or allowed CCE to conceal these channel stuffing practices. The Company's public statements routinely explained shifts in

CCE's revenues, earnings, and sales volume figures on the weather, price and cost structure changes, new product introductions, and marketing efforts. While these matters clearly affect revenue, earnings, and sales volumes, the Company's publicly disclosed explanations of its historical financial results and future prospects were misleading without additional disclosures regarding the Company's channel stuffing practices and how those practices affected both CCE's historical financial results and its future prospects.

8.     CCE's channel stuffing practices coincided with the improper recognition of revenue in violation of Generally Accepted Accounting Principles ("GAAP"), which in turn artificially inflated CCE's publicly reported financial condition. Consequently, the Company's and defendants' representations during the Relevant Period that CCE's financial statements complied with GAAP were also rendered false.

9.     On July 29, 2004, defendants caused or allowed CCE to disclose that it would not meet its previously estimated earnings guidance for FY:04, due primarily to declines in its North American and European sales volumes. Rather than reveal the true primary underlying cause of those volume declines, namely CCE's channel stuffing practices, these statements improperly blamed the "weather." Although the weather may have played some role, these statements did not disclose -- nor have they ever disclosed -- that a proximate cause of the decline was the channel stuffing practices that defendants were allowing to run rampant at CCE.

10.     In advance of this disclosure and while CCE's stock price was artificially inflated, defendant Summerfield Johnston, Jr., the grandson of the founder of Coke, sold over $86.4 million of his personal holdings of CCE stock, concluding his insider selling activities on July 28, 2004, the day before the Company issued a corrective

4

earnings announcement that resulted in a nearly 25% drop in CCE's market capitalization in a single day.

## THE PARTIES

11.     Plaintiff Doris Staehr is, and was at times relevant hereto, an owner and holder of CCE common stock. Plaintiff Doris Staehr is a citizen of California.

12.     Nominal defendant CCE is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at 2500 Windy Ridge Parkway, Atlanta, Georgia. CCE engages in the manufacture, distribution, sale, and marketing of nonalcoholic beverages primarily under agreements with Coke.

13.     Defendant John R. Alm ("Alm") was Chief Executive Officer ("CEO") of CCE at all times relevant hereto from January 2004 until January 2006. Alm was President and a director of CCE at all times relevant hereto until January 2006. Alm was Chief Operating Officer of CCE at all times relevant hereto, until his promotion to CEO in January 2004. Because of Alm's positions, he knew the adverse, non-public information about the business of CCE, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' ("Board") meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Alm participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:04, CCE paid defendant Alm $1,640,820 in restricted shares, $1,039,314 in salary and other compensation, and granted him 245,000 options to purchase CCE stock. For FY:03, CCE paid defendant Alm $957,556 in bonuses, $3,066,000 in restricted shares, $1,018,127 in salary and

5

other compensation, and granted him 250,000 options to purchase CCE stock. Alm is a citizen of Georgia.

14.    Defendant Lowry F. Kline ("Kline") is, and at all times relevant hereto was, Chairman of the Board of CCE. Kline was CEO of CCE at all times relevant hereto, until January 2004. Kline is interim CEO of CCE and has been since January 2006. Because of Kline's positions, he knew the adverse, non-public information about the business of CCE, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.   During the Relevant Period, Kline participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:04, CCE paid defendant Kline $1,426,800 in restricted shares, $970,175 in salary and other compensation, and granted him 200,000 options to purchase CCE stock. For FY:03, CCE paid defendant Kline $1,004,261 in bonuses, $3,285,000 in restricted shares, $1,053,404 in salary and other compensation, and granted him 280,000 options to purchase CCE stock. Kline is a citizen of Tennessee.

15.    Defendant Patrick J. Mannelly ("Mannelly") was Chief Financial Officer of CCE at times relevant hereto until August 2004. Because of Mannelly's position, he knew the adverse, non-public information about the business of CCE, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.   During the Relevant Period, Mannelly

participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:03, CCE paid defendant Mannelly $332,665 in bonuses, $944,100 in restricted shares, $399,032 in salary and other compensation, and granted him 50,000 options to purchase CCE stock. During the Relevant Period, Mannelly sold 207,463 shares of CCE stock for proceeds of $5,286,315.50. Defendant Mannelly is a citizen of Georgia.

16.     Defendant Rick L. Engum ("Engum") was Vice President, Controller and Principal Acounting Officer of CCE at times relevant hereto until July 2004. Because of Engum's positions, he knew the adverse, non-public information about the business of CCE, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Engum participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Engum sold 20,050 shares of CCE stock for proceeds of $479,002.00. Defendant Engum is a citizen of Georgia.

17.     Defendant E. Liston Bishop, III ("Bishop") is, and at all times relevant hereto was, Vice President, Secretary and Deputy General Counsel of CCE. Because of Bishop's positions, he knew the adverse, non-public information about the business of CCE, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant

7

Period, Bishop participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Bishop is a citizen of Tennessee.

18.     Defendant G. David Van Houten, Jr. ("Van Houten") is, and at all times relevant hereto was, Executive Vice President, Chief Operating Officer and President, North American Business Unit of CCE. Because of Van Houten's positions, he knew the adverse, non-public information about the business of CCE, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Van Houten participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:04 and FY:03, CCE paid defendant Van Houten $367,001 and $450,582, respectively, in bonuses, $951,200 and $1,049,000, respectively, in restricted shares, $725,998 and $630,130, respectively, in salary and other compensation, and granted him 100,000 and 75,000 options, respectively, to purchase CCE stock. During the Relevant Period, Van Houten sold 136,403 shares of CCE stock for proceeds of $3,696,559.09. Defendant Van Houten is a citizen of Texas.

19.     Defendant J. Trevor Eyton ("Eyton") is, and at all times relevant hereto was, a director of CCE. Because of Eyton's position, he knew the adverse, non-public information about the business of CCE, as well as finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to

8

him in connection therewith. Further, Eyton was President and CEO, later Chairman, and now a director of Brascan Corporation, a natural resources, integrated power systems, real estate development and management, and financial services company, since October 1979. He was a director of Coca-Cola Beverages Ltd., a Canadian bottler of Coca-Cola, until its acquisition by Coca-Cola Enterprises in 1997. During the Relevant Period, Eyton participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Eyton is a citizen of Florida.

20. Defendant Gary P. Fayard ("Fayard") is, and at all times relevant hereto was, a director of CCE. Because of Fayard's position, he knew the adverse, non-public information about the business of CCE, as well as finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Further, Fayard has been Executive Vice President since February 2003, and CFO since December 1999 of Coke; before that he had been Senior Vice President since December 1999. He is a director of Coca-Cola FEMSA, S.A. de C.V., a Latin American bottler of Coca-Cola. During the Relevant Period, Fayard participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Fayard is a citizen of Georgia.

21. Defendant L. Phillip Humann ("Humann") is, and at all times relevant hereto was, a director of CCE. Because of Humann's position, he knew the adverse, non-public information about the business of CCE, as well as finances, markets and present and future business prospects, via access to internal corporate documents,

9

conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  Further, Humann has been Chairman and CEO of SunTrust Banks, Inc., a bank holding company, since March 1998, also serving as President from March 1998 to December 2004. He is also a director of Equifax Inc., a credit information provider, and Haverty Furniture Companies, Inc., a furniture retailer.   During the Relevant Period, Humann participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Humann is a citizen of Georgia.

22.    Defendant Paula G. Rosput Reynolds ("Reynolds") is, and at all times relevant hereto was, a director of CCE.  Because of Reynolds' position, she knew the adverse, non-public information about the business of CCE, as well as finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith.  Further, Reynolds has been Chairman of AGL Resources Inc., a regional energy services holding company, since February 2002, and President and CEO since August 2000.  She has been Chairman of Atlanta Gas Light Company, a natural gas distributor, since November 2000; she was Chairman, President and CEO of Atlanta Gas Light Company from August 2000 until November 2000 and President and Chief Operating Officer of that company from September 1998 until November 2000.  During the Relevant Period, Reynolds participated in the issuance of false and/or misleading statements, including

the preparation of the false and/or misleading press releases and SEC filings. Defendant Reynolds is a citizen of Georgia.

23.    Defendant Marvin J. Herb ("Herb") is, and at all times relevant hereto was, a director of CCE. Because of Herb's position, he knew the adverse, non-public information about the business of CCE, as well as finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Further, Herb has been Chairman of HERBCO L.L.C. since July 2001. Before that, he was president and director of Herbco Enterprises Inc., a Coca-Cola bottler, until it was acquired by CCE in July 2001. During the Relevant Period, Herb participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Herb is a citizen of Illinois.

24.    Defendant James E. Copeland, Jr. ("Copeland") is a director of CCE and has been since 2003. Because of Copeland's position, knew the adverse, non-public information about the business of CCE, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Further, Copeland was CEO, Deloitte & Touche USA, LLP and Deloitte Touche Tohmatsu from 1999 until his retirement in May 2003. During the Relevant Period, Copeland participated in the issuance of false and/or misleading statements, including the preparation of the false

11

and/or misleading press releases and SEC filings. Defendant Copeland is a citizen of Georgia.

25.     Defendant Calvin Darden ("Darden") is, and at all times relevant hereto was, a director of CCE and has been since January 2004. Because of Darden's position, he knew the adverse, non-public information about the business of CCE, as well as finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Further, Darden is Senior Vice President of U.S. Operations of United Parcel Service, Inc., an express carrier and package delivery company. In December 1997, he was elected Senior Vice President of Domestic Operations and in January 2000 he was elected to his current position. He is also a director of United Parcel Service, Inc. and Target Corporation, a retailer. During the Relevant Period, Darden participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Darden is a citizen of Georgia.

26.     Defendant J. Alexander M. Douglas, Jr. ("Douglas") is, and at all times relevant hereto was, a director of CCE and has been since October 2004. Because of Douglas' position, he knew the adverse, non-public information about the business of CCE, as well as finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Further, Douglas has been Senior Vice President and Chief Customer Officer of Coke

since February 2003.  Prior to that, he was President of Coke's North American Division within the North America strategic business unit from 2000 to 2003.  He was Vice President of Coke's CCE Sales & Marketing Group from 1998 to 2000.  During the Relevant Period, Douglas participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Douglas is a citizen of Georgia.

27.    Defendant Irial Finan ("Finan") is, and at all times relevant hereto was, a director of CCE and has been since October 2004.  Because of Finan's position, she knew the adverse, non-public information about the business of CCE, as well as finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith.  Further, Finan has been Executive Vice President of Coke since October 2004, and President of Bottling Investments since August 2004.  Before that, he was CEO of Coca-Cola Hellenic Bottling Company S.A., one of the largest Coca-Cola bottlers in the world, from May 2001 to 2003.  During the Relevant Period, Finan participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Finan is a citizen of Georgia.

28.    Defendant Howard G. Buffett ("Buffett") was a director of CCE at all times relevant hereto, until April 2004.  Because of Buffett's position, he knew the adverse, non-public information about the business of CCE, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and

13

other information provided to him in connection therewith.  Further, Buffett is President of BioImages, a photography publishing company, and also, since December 1999, President of The Howard G. Buffett Foundation, a charitable foundation.  He was Chairman of the Board of Lindsay Manufacturing Co., a manufacturer of agricultural irrigation products, until January 2003, and is currently a director.  He was Chairman of the Board of The GSI Group, a manufacturer of agricultural equipment, from June 1996 to September 2001.  During the Relevant Period, Buffett participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Buffett is a citizen of Illinois.

29.    Defendant Steven J. Heyer ("Heyer") was a director of CCE at all times relevant hereto, until September 2004.  Because of Heyer's position, he knew the adverse, non-public information about the business of CCE, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  Further, Heyer has been President and Chief Operating Officer of Coke since December 2002.  Prior to that, he had been Executive Vice President of Coke from April 2001 and President and Chief Operating Officer, Coca-Cola Ventures, from March 2001.  During the Relevant Period, Heyer participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Defendant Heyer is a citizen of Georgia.

30.    Defendant Deval L. Patrick ("Patrick") was a director of CCE at all times relevant hereto, until July 2004.  Because of Patrick's position, he knew the adverse,

non-public information about the business of CCE, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Further, Patrick has been Executive Vice President and General Counsel of Coke since April 2001 and Corporate Secretary since January 2003. From 1999 until 2001, he had been Vice President and General Counsel of Texaco, Inc., a petroleum company, now ChevronTexaco Corp. During the Relevant Period, Patrick participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Patrick is a citizen of Massachusetts.

31.   Defendant John L. Clendenin ("Clendenin") was a director of CCE at all times relevant hereto, until April 2005. Because of Clendenin's position, he knew the adverse, non-public information about the business of CCE, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Further, Clendenin has been Chairman Emeritus of BellSouth Corporation, a telecommunications holding company, since 1997. During the Relevant Period, Clendenin participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Clendenin is a citizen of Florida.

32. Defendant John E. Jacob ("Jacob") was a director of CCE at all times relevant hereto, until April 2005. Because of Jacob's position, he knew the adverse, non-public information about the business of CCE, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Further, Jacob has been Executive Vice President—Global Communications of Anheuser-Busch Companies, Inc., a brewer, since July 2002 and a director of that company since 1990. He was Executive Vice President and Chief Communications Officer from 1994 to 2002. During the Relevant Period, Jacob participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Jacob is a citizen of Missouri.

33. Defendant Summerfield K. Johnston, Jr. ("Johnston, Jr.") was a director of CCE at all times relevant hereto, until April 2004. Because of Johnston, Jr.'s position, he knew the adverse, non-public information about the business of CCE, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. Further Johnston, Jr. was Chairman of CCE's executive committee, and was Chairman of CCE from October 1997 until April 2002 and CEE's CEO from December 1991 until April 1998 and from January 2000 through April 2001. During the Relevant Period, Johnston, Jr. sold 3,226,682 shares of CCE stock for proceeds of $86,441,257.85. During the Relevant Period, Johnston, Jr. participated in the issuance of false and/or

16

misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Defendant Johnston, Jr. is a citizen of Tennessee.

34.     The defendants identified in ¶¶14, 19-33 are referred to herein as the "Director Defendants." The defendants identified in ¶¶13-18 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶15-16, 18, 33 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

35.     By reason of their positions as officers, directors and/or fiduciaries of CCE and because of their ability to control the business and corporate affairs of CCE, the Individual Defendants owed CCE and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage CCE in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of CCE and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

36.     Each director and officer of the Company owes to CCE and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so

that the market price of the Company's stock would be based on truthful and accurate information.

37.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of CCE, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with CCE, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of CCE.

38.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of CCE, and was at all times acting within the course and scope of such agency.

39.     To discharge their duties, the officers and directors of CCE were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of CCE were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e) remain informed as to how CCE conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f) ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

40. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CCE, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual

19

Defendants who collectively comprised all of CCE's Board during the Relevant Period.

41.    The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein infra, and by failing to prevent the Individual Defendants from taking such illegal actions. In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action law suits that allege violations of federal securities laws. As a result, CCE has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)    Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)    Costs incurred in investigating and defending CCE and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

(c)    Additional costs in the form of increased directors' and officers' liability and fiduciary liability insurance premiums;

(d)    Costs incurred from directing manpower to correct CCE's defective internal controls; and

(e)    Costs incurred in investigating and defending CCE and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

42.    Moreover, these actions have irreparably damaged CCE's corporate image and goodwill. For at least the foreseeable future, CCE will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have

20

been implicated in illegal behavior and have misled the investing public, such that CCE's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

43.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

44.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at CCE and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and  (iii) deceive the investing public, including shareholders of CCE, regarding the Individual Defendants' management of CCE's operations, the Company's financial health and stability, and future business prospects, specifically related to the Company's financials that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

45.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least October 2003 and continuing thereafter. During this time the Individual Defendants caused the

21

Company to conceal the true fact that CCE was misrepresenting its financial results. In addition, defendants also made other specific, false statements about CCE's financial performance and future business prospects, as alleged herein.

46.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition and future business prospects; and to artificially inflate the price of CCE common stock so they could: (i) dispose of over $95.9 million of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

47.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

48.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## CHANNEL STUFFING

49.     One of the key metrics of the soft-drink beverage industry is the volume of product sold, measured in case sales of finished or bottled product. CCE's reported sales volume figures are correlated with the Company's: (i) intrinsic consumer demand for CCE's products; (ii) prospects for fixture growth in that demand and, thus, prospects for future growth in CCE's sales revenue; and (iii) CCE's relative market strength when compared to its competitors. Consequently, an inflation of CCE's reported sales volume would result in a gross distortion of the Company's reported earnings potential.

50.     During the Relevant Period, the Individual Defendants caused or allowed rampant channel stuffing practices to occur at CCE. As a result, CCE personnel routinely stuffed CCE's finished soft drink and beverage products into the sales channels of its retailer and reseller customers in order to meet the Company's internally planned soft drink and beverage sales volume figures, as well as revenue and earnings targets and publicly stated future earnings guidance. These channel stuffing practices pushed excess products onto customers through a variety of mechanisms including: (i) advance warnings of future price increases; (ii) price discounts for accepting extra product volume beyond the customers' immediate needs; (iii) delivering more product than the customer requested; (iv) providing various cash incentives to customers termed as "marketing allowances; (v) providing non-cash incentives to customers ranging from tickets to sporting events, signed sports memorabilia, and Coca-Cola trademarked items; (vi) "park and hold" strategies whereby CCE delivered large shipments of product - usually tractor trailer loads - to customers, leaving the trailers in the parking lot; and (vii) granting customers the right to return expired or unsellable product.

51.     The targets of these channel stuffing practices ran the full gamut of CCE's customer base including: (i) retail grocery store outlets like King Soopers, Safeway, Krogers, Pathmark, Albertsons and Vons; (ii) convenience stores like 7-Eleven and gas station retail stores like Exxon and BP; (iii) club style retail stores such as Sam's Club and Costco; (iv) drugstores such as Walgreens and Eckerd's; (v) large department stores such as Wal-Mart and Target; (vi) wholesale vendors that re-sell the product in vending equipment, such as Vend One; and (vii) vending machines.

## IMPROPER STATEMENTS

52.     The Individual Defendants, by their fiduciary duties of care, good faith and loyalty, owed to CCE a duty to insure that the Company's financial reporting fairly presented, in all material respects, the operations and financial condition of the Company. In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material non-public information to be either disclosed or omitted from the Company's public statements. Furthermore, defendants Copeland, Herb, Clendenin and Reynolds, as members of the Audit Committee, had a special duty to know and understand this material information as set out in the Audit Committee's charter which provides that the Audit Committee is responsible for discussing with management the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies. Defendants Alm, Kline, Mannelly, Engum, Bishop, and Van Houten, as officers of CCE, had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, defendants Alm, Kline, Eyton, Fayard, Humann, Reynolds, Darden, Herb, Copeland, Douglas, Finan, Johnston, Jr. Buffett, Heyer, Patrick, Clendenin and Jacob, as directors of CCE had ample opportunity to discuss this

24

material information with management and fellow directors at any of the Board meetings that occurred during the Relevant Period as well as at meetings of committees of the Board.  Despite these duties, the Individual Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by CCE to the investing public and the Company's shareholders during the Relevant Period.

53.     On October 15, 2003, the Individual Defendants caused or allowed CCE to issue a press release entitled, "Coca-Cola Enterprises Inc. Reports Third-Quarter 2003 Results."  The press release stated in relevant part:

> Coca-Cola Enterprises Inc. today reported third-quarter 2003 net income applicable to common shareowners of $259 million, or 56 cents per diluted common share, including the net benefit of 1 cent per share from tax items. For the first nine months of 2003, net income totaled $545 million, or $1.19 per diluted common share. Year-to-date results include 1 cent per diluted common share from the sale of a hot-fill manufacturing facility to The Coca-Cola Company, and net favorable tax items of 2 cents per diluted common share. Our 2003 results compare to third-quarter 2002 net income applicable to common shareowners of $190 million, or 42 cents per diluted common share, and $414 million or 91 cents per share for the first nine months of 2002.

>                               *   *   *

> "Our third-quarter results reflect our unwavering commitment to North American and European pricing improvement and our ability to successfully manage growth in operating expenses," said Lowry F. Kline, chairman and chief executive officer. "Based on our strong third quarter performance, which includes the continued benefits of favorable interest rates and currency translations, we have now increased our expectations for reported 2003 earnings per share to a range of $1.31 to $1.33."

> Consolidated physical case bottle and can volume increased 2 1/2 percent on a comparable(a) basis for the third quarter, and 2 percent for the first nine months. North American volume grew 1/2 percent in the third quarter partly due to strong sales of Dasani, growth in diet brands, including diet Vanilla Coke, and lemon-lime category growth from the introduction of Sprite Remix. This offset slower sales of flavored drinks, and the extraordinary volume generated by the introduction of Vanilla Coke in 2002. In Europe, record-setting hot weather for much of the quarter, coupled with the success of new brand introductions and local marketing programs, resulted in a 10 percent volume increase during the

third quarter. For the year, Europe's volume has grown more than 7 1/2 percent. We estimate approximately 2 percent of Europe's year-to-date growth is attributable to this summer's heat.

54.     In CCE's accompanying October 15, 2003 earnings conference call, defendant Alm stated in his opening remarks:

> [W]e achieved very solid profit growth in the third quarter through a combination of consistent pricing initiatives, cost control, and very strong operating performance in our European territory...
>
> Based on the first nine months of this year, we are raising our full-year EPS forecast to a range of $1.31 to $1.33....
>
> We now expect our operating income for the year to be in the range of $1.46 billion to $1.48 billion... The critical factors behind our performance have been our strong commitment to revenue management and our work to control our costs and operating expenses...
>
> Now looking at our quarterly volume performance, third quarter volume in North America slightly exceeded our expectations and ended the quarter up approximately .5% while Europe volume grew 10% aided significantly by what was the warmest summer in recent history in Europe. North America volume growth was .5% for the first nine months in part due to lapping the extraordinary volume generated with the introduction of Vanilla Coke and the strong performance of our Minute Maid portfolio a year ago.
>
> Our volume in Europe certainly was helped by the incredibly hot summer throughout the region, as the weather turned what would have been a solid quarter into an extraordinary quarter. With the introduction of new product initiatives such as Vanilla Coke, Diet Vanilla Coke, and Coke Light with Lemon, and with the continued growth of existing brands, we were well-positioned for good volume growth in the third quarter in Europe exclusive of the weather benefits.
>
> It is important to note the contribution of our existing brands to our third quarter volume growth in Europe, also Brand Coca-Cola grew 4%, generating more case growth than the total volume for Vanilla Coke in Europe. Diet Coke and Coke Light grew approximately 10%. And Fanta, our third largest brand in Europe, grew more than 11% in the quarter on top of substantial growth in 2002. Fourth quarter volume in Europe will likely be flat with core brand growth offset by our planned de-emphasis of some lower margin promotional volume that we realized in the fourth quarter of the prior year. We continue to expect full-year European volume growth of approximately 5% to 6%.

55.    In the same October 15, 2003 earnings conference call, defendant

Mannelly stated in his opening remarks:

> [W]e have raised our earnings guidance for the full year to a range of
> $1.31 to $1.33 per share, which includes 3 cents of favorable items
> mentioned in the release. Accordingly, we expect fourth quarter
> operations to generate earnings of 12 to 14 cents per share.
>
> Additionally, we expect fourth quarter operations to generate operating
> profit equal to or slightly below prior year, due to flat volume in both
> Europe and North America as well as the recognition of SGI funding for
> the quarter below prior year amounts.  Last quarter we forecasted our
> SGI-related funding from the Coca-Cola Company to be approximately
> $40 million below planned levels due to lower volume growth in North
> America.
>
> Our funding has been consistent each quarter this year as we benefited
> from carry-over volume as well as strong results in Europe. However,
> expected volume in North America and Europe for the fourth quarter
> will result in fourth quarter funding below prior year levels and
> negatively impact our fourth quarter operating results comparison.
>
> As John mentioned, our full-year operating income results are expected
> to total approximately $1.46 to $1.48 billion, up 7 to 9% versus prior
> year.

56.    Emphasizing the importance of Coke's SGI payments, defendant

Mannelly later commented:

> with regards to the financial aspects of the fourth quarter, our operating
> results in the fourth quarter are really being affected.  The growth rate is
> being affected by the reduction in SGI funding.  So that's the primary
> reason why operating results appear to be forecasted as flat.

57.    Finally, in response to a question from Art Cecil, an analyst from T.

Rowe Price, regarding CCE's FY:03 earnings guidance and the effect on it from

defendants' favorable weather claims, Scott Anthony, CCE's Vice President of

Investor Relations stated, "Primarily they've been eaten up by North America

underperforming where we thought they would be early in the year."

58.     On October 31, 2003, the Individual Defendants caused or allowed CCE

to file its 3Q:03 Form 10-Q. The filing repeated the financial information disclosed in

CCE's October 15, 2003 press release. The Form 10-Q stated in part:

> Our operating results in the third quarter of 2003 reflect continued strong year-over-year growth in Europe partially because of favorable weather conditions, meaningful pricing initiatives in North America and Europe, and moderating operating expense trends in North America. Third quarter 2003 currency-neutral bottle and can net price per case increased 1 1/2 % in North America and 3 1/2 % in Europe over the same period last year.
>
> For the third quarter of 2003, net income applicable to common shareowners increased to $259 million, or $0.56 per diluted common share, including a $0.01 per share net benefit from the favorable resolution of tax items. This represents an increase of approximately 36% over net income applicable to common shareowners of $190 million for the same quarter last year. Operating income increased 19% over third quarter 2002 results to $524 million for third quarter 2003, impacted by strong growth in our European operations, favorable pricing results in both North America and Europe, and our ability to successfully manage operating expenses.

                        *   *   *

Net Operating Revenues

> Our third quarter 2003 net operating revenues increased 9% to $4.7 billion. This increase was primarily a result of favorable currency exchange rate movement (4%), an increase in pricing (2 1/2%), and improved volume (2 1/2%). For the first nine months of 2003, the percentage of consolidated net operating revenues derived from our North American and European groups was 72%, and 28%, respectively.

                        *   *   *

> Consolidated comparable bottle and can volume for the third quarter of 2003 increased 2 1/2% over the same quarter last year. Volume in North America was up 1/2%. Strong sales of Dasani, solid growth in our diet portfolio, and growth in our lemon-lime category from the introduction of Sprite Remix were offset by slower sales of flavored drinks and overcoming the extraordinary volume generated by the introduction of Vanilla Coke in 2002. Strong volume increases in Belgium, Great Britain, and France contributed to comparable volume growth in Europe of 10%.
>
> In North America, we continued to work through the hurdle of 2002 volume growth created by strong Minute Maid performance and by

28

the introduction of Vanilla Coke. We benefited from very strong North American diet soft drink growth of 8% in the quarter, with improvement from diet Coke, up 5%, diet Cherry Coke, with volume more than double versus a year ago, and from diet Vanilla Coke, which has performed very steadily since its introduction in late 2002. In flavored soft drinks, Sprite Remix has proven a solid addition to our portfolio, with more than a third of its volume in our 20-ounce package. In packaging, we are expanding our distribution of 6-pack 24-ounce carbonated soft drink products with good consumer response. We are also steadily moving forward with the implementation of Fridge Pack throughout North America, which is now available in markets constituting more than 75% of our volume. Full-year North American volume is expected to remain essentially flat.

*   *   *

Third quarter 2003 European volume benefited from favorable weather for much of the quarter, success from the introductions of Vanilla Coke and diet Vanilla Coke and the success of local marketing programs. Carbonated soft drink volume for third quarter 2003 in Europe increased approximately 9% over third quarter 2002, with brand Coca-Cola growing 4%, diet Coke and Coca-Cola light growing approximately 10%, and Fanta, our third largest brand in Europe growing more than 11% on top of substantial growth in 2002. European volume is expected to grow 5% to 6% for full year 2003.

59.   Defendants Mannelly and Engum signed the 3Q:03 Form 10-Q. Further, the Form 10-Q was certified under §302 of Sarbanes-Oxley Act of 2002 by defendants Klein and Mannelly. The certifications stated in part:

Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

60.   On December 17, 2003, the Individual Defendants caused or allowed CCE to issue a press release entitled, "Coca-Cola Enterprises Inc. Affirms 2003 Financial Targets And Outlines Expectations For 2004." The press release provided in relevant part:

Management continues to expect approximately flat volume performance in North America for 2003 while achieving growth in Europe of approximately 5 percent for the full year, Reported earnings per diluted common share for the year are expected to total approximately $1.39, including the net effect of insurance proceeds and other items. ...

\* \* \*

2004 Outlook

In its outlook for 2004, CCE expects to achieve physical case volume growth in North America of approximately 1 1/2 percent. Management expects enhanced revenue management strategies to produce bottle and can net pricing per case growth in North America through a combination of rate and mix of approximately 2 1/2 percent.

Our European business is expected to remain strong in 2004. While bottle and can net pricing is expected to grow approximately 2 percent, our forecasted volume growth will be approximately 1 1/2 percent. Although this growth is below long-term trends, this outlook primarily reflects our strategic decision to develop a new water portfolio with The Coca-Cola Company. This transition will have a negative impact on volume growth during 2004, but we remain committed to a long-term growth rate of 4 percent to 6 percent.

CCE expects 2004 net income per diluted common share to increase to a range of $1.41 to $1.44. Our underlying operating profit growth rate is expected to reach a high single-digit range in 2004, though increased pension expense will result in operating income growth of 5 percent to 6 percent from comparable 2003 levels. 2003 reported operating profit is expected to total approximately $1.53 billion. Comparable 2003 operating profit of approximately $1.47 billion excludes an $8 million gain on the sale of a facility to The Coca-Cola Company, approximately $70 million in insurance proceeds and $25 million of expense primarily related to the funding of certain employee benefit programs. Management also expects a stronger return on invested capital with a 30 to 40 basis point gain in 2004.

"Our company will achieve improved financial results in 2003 and we fully intend to build on these results with even better operating performance in 2004," said Lowry F. Kline, chairman and chief executive officer. "Despite challenging operating conditions through much of this year, we made significant financial progress, generating higher free cash flow, a 40 basis point improvement in return on invested capital, and an approximate $400 million reduction in net debt balance."

"Two primary factors for our future success, in North America and Europe, are a clear company focus on revenue management and continued brand and package development," said John R. Alm, president and chief operating officer. "In North America, we expect continued

strength in our diet soft drink brands, water, and juice drinks, while package innovations will add value to our brands.

"Our business plan in Europe includes several excellent products and brand initiatives that, when coupled with plans for solid, creative advertising, will enable us to continue to build a strong European soft drink culture."

61.   On January 29, 2004, the Individual Defendants caused or allowed the

Company to issue a press release entitled, "Coca-Cola Enterprises Inc. Reports

Fourth-Quarter and Full-Year 2003 Results." The press release provided in relevant

part:

Coca-Cola Enterprises Inc. today reported that fourth-quarter 2003 net income applicable to common shareowners increased to $128 million, or 28 cents per diluted common share. Operating income grew to $346 million in the fourth quarter, up 38 percent versus prior year results.

Full-year 2003 net income totaled $674 million, or $1.46 per diluted common share. Operating income totaled $1,577 million in 2003, an increase of 16 percent.

\* \* \*

- Comparable fourth-quarter 2003 net income per diluted common share was 17 cents, up 31 percent from comparable prior year results. Full-year 2003 net income per share totaled $1.32, an increase of 28 percent over comparable 2002 results.

- Comparable fourth-quarter 2003 operating income grew 5 percent to $264 million, while full-year 2003 comparable operating income increased 9 percent to $1,487 million.

Our 2003 financial performance reflects strong growth in Europe, consistent pricing initiatives throughout our territories, and favorable foreign currency translations. ...

\* \* \*

Consolidated physical case bottle and can volume decreased I percent on a comparable basis for the fourth quarter, and increased 1 1/2 percent for full year 2003.   North American volume was down approximately 1 percent in the fourth quarter, and flat for the full year. Our full year 2003 volume results in North America were characterized by growth in diet soft drink brands, including diet Vanilla Coke, strong sales of Dasani, and lemon-lime category growth from the introduction of Sprite Remix. This offset slower sales of regular soft drinks and the

31

comparisons resulting from the introduction of regular and diet Vanilla Coke in 2002.

In Europe, volume was down approximately 1 1/2 percent in the fourth quarter as we decreased promotional activity and deemphasized certain low value brands in our portfolio. For the full year, European volume increased 5 1/2 percent reflecting record-setting hot weather during the summer months, the success of local marketing programs, and new brand introductions, including Vanilla Coke and Diet Coke/Coke light with Lemon.

"Our dedication to revenue management was essential to our success for the year, and we will enhance this strategic commitment in 2004," said John R. Alm, president and chief executive officer. "Strong, popular brands, in the right package, make revenue enhancement possible and sustainable through a combination of rate and mix. It is vital that we continue to build our brands with even higher levels of demand creation, innovation and marketplace execution.

"We plan continued product and package development, already demonstrated by the introduction of Diet Coke with Lime, as well as significant brand building activities in support of our existing brands, including the NCAA Final Four and a unique summer initiative," Mr. Alm said. "We believe these efforts will drive growth and increase value in the year ahead, benefiting customers and consumers in North America and Europe."

\* \* \*

Full-Year 2004 Outlook

Full-year 2004 earnings per diluted common share are now expected in a range of $1.42 to $1.46. 2004 operating profit is expected to increase 5 percent to 6 percent from comparable 2003 operating profit of $1,487 million. 2004 operating income expectations include the impact of a significant increase in pension expense, which will negatively impact 2004 growth by approximately 3 percent. We do not foresee a significant pension expense increase in 2005.

Full-year 2004 physical case bottle and can volume growth is expected to total approximately 1 1/2 percent in both North America and Europe. While expected volume growth in Europe is below our long-term trends, our outlook for 2004 reflects our strategic decision to develop a new water portfolio with The Coca-Cola Company, combined with hurdling the volume generated by last summer's record setting hot weather. We remain committed to a long-term growth rate of 4 percent to 6 percent for our European territories.

62.     In his opening remarks during a January 29, 2004 earnings conference

call held in conjunction with the earnings release, defendant Klein stated:

> As noted in the release, we achieved excellent full year 2003 financial results, and have now increased our guidance for 2004.
>
> For the full year 2003, our net income totals $674 million, or $1.46 per share - including the net benefit of favorable items totaling 14 cents per share.
>
> On a comparable basis, our per-share results were up 29 percent and our operating income grew 9 percent to a total of $1.487 billion dollars.
>
> In achieving these performance levels during 2003, we made very significant improvement in three additional key financial measurements- - we've increased our free cash flow by more than $300 million to a total of approximately $700 million. We've reduced our debt balance by approximately $400 million and we improved our return on invested capital by 40 basis points.
>
> Several factors enabled us to achieve these results, including a strong commitment to improve revenue management with North American pricing of 2 percent and European pricing growth of approximately 2.5 percent for the year.
>
> *   *   *
>
> Although it proved difficult to grow North American volume, we're still pleased that we were able to outpace the industry, even as cycled the highly successful introduction of regular and diet Vanilla Coke, we dealt with the well-documented external factors that effected the entire industry and we maintained our revenue management initiatives throughout all that.
>
> We believe that we have continued to build strong braid equity and we have positioned ourselves for the resumption of North America volume growth in 2004.
>
> In Europe, product innovation, package innovation, excellent marketing, and a record-setting summer heat, combined -- all combined to create full year 2003 volume growth of 5.5 percent. ...
>
> Overall, we're very pleased with the ongoing progress that our 2003 results represent. Our goal is the same as it always has been -- building long-term shareholder value. That's a goal we feel like we are accomplishing with consistent profit growth.
>
> Our 2004 guidance calls for volume growth of 1.5 percent in North America and pricing growth of 2.5 percent. When coupled with

33